Sa'id Vakili, Esq. (SBN: 176322)
vakili@vakili.com
Craig McLaughlin, Esq. (SBN: 182876)
craig@vakili.com
Jason C. Ming, Esq. (SBN: 219745)
jason@vakili.com
Stephen P. Hoffman, Esq. (SBN: 287075)
hoffman@vakili.com
**VAKILI & LEUS, LLP**
3701 Wilshire Boulevard, Suite 1135
Los Angeles, California 90010-2822
**213/380-6010** | Fax: 213/380-6051

*Counsel for Plaintiff DNA Specialty, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| **DNA SPECIALTY, INC., a California Corporation,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SHARKROAD, INC., a California Corporation and DOES 1-50, Inclusive,**<br><br>**Defendants.** | **CASE NO.: 2:25-cv-10379-MWC (RAOx)**<br><br>[*Hon. Rozella A. Oliver, United States Magistrate Judge*]<br><br>**PLAINTIFF DNA SPECIALTY, INC.'S STATEMENT FOR THE NOVEMBER 23, 2026 INFORMAL DISCOVERY CONFERENCE IN RESPONSE TO SHARKROAD, INC.'S SUPPLEMENTAL STATEMENT REGARDING REMAINING DISCOVERY DISPUTES (DKT. 68)**<br><br>Informal Discovery Conference: November 23, 2026, 11:00 a.m. (Zoom)<br><br>Fact Discovery Cutoff: December 4, 2026 |

**TO THE HONORABLE ROZELLA A. OLIVER, UNITED STATES MAGISTRATE JUDGE, AND TO DEFENDANT SHARKROAD, INC. AND ITS COUNSEL OF RECORD:**

Plaintiff DNA Specialty, Inc. ("DNA") submits this statement in advance of the further informal discovery conference set for Monday, November 23, 2026 at 11:00 a.m., in response to the Supplemental Statement Regarding Remaining Discovery Disputes that Defendant Sharkroad, Inc. ("Sharkroad") filed on November 20, 2026 (Dkt. 68). Because the Court indicated at the November 9 conference that it would consider shifting deposition costs if DNA's supplementation required the depositions to be held open, and because Sharkroad's counsel raised cost-shifting in correspondence, this statement also addresses that subject, although Dkt. 68 does not request it.

## I. SUMMARY

DNA has done what the Court asked of it on November 9. Since the conference, DNA has served 276 pages of amended discovery responses that answer each of Sharkroad's 25 interrogatories with facts and that identify, by Bates number, the documents responsive to each of Sharkroad's 118 requests for production, and it has produced 222 pages of additional documents (DNA-00473–00694) in three productions on November 16, 17, and 18. ***Every amended response to a request for production states what DNA has produced, states that DNA has located nothing further, and states whether anything is being withheld, as Rule 34(b)(2)(C) requires.*** The amended interrogatory responses are verified by DNA's Vice President, and the contentions that rest on documents Sharkroad has designated "Attorneys' Eyes Only" are set out in a separate supplement, signed and verified by DNA's counsel under Rule 33(b)(1)(B), that Sharkroad's counsel has had since November 19. The verifications were served on November 20, before Sharkroad filed Dkt. 68. (Vakili Decl. Ex. G.)

Sharkroad's supplemental statement does not ask the Court to shift the cost of the depositions. It now asks instead for five preclusion orders: an order that DNA "may not supplement its document production" in thirteen categories — in substance, all of them — after November 17, 2026, and orders precluding DNA from relying on damages computations, continuous-use testimony, exclusivity evidence, and confusion evidence that Sharkroad characterizes as untimely. (Dkt. 68 at 10.) Those are evidence-preclusion sanctions under Rule 37, and as to damages, priority of use, and confusion they would be tantamount to dismissal of DNA's claims. They cannot be entered at an informal conference; they require a motion, a discovery order that was disobeyed or a disclosure that was not made, findings of willfulness, fault, or bad faith, and consideration of lesser sanctions. *R & R Sails, Inc. v. Insurance Co. of Pennsylvania*, 673 F.3d 1240, 1247 (9th Cir. 2012). None of that is present. The predicate Sharkroad offers is that two sets of interrogatory responses were served one and two days after a date the parties agreed to by stipulation — ***the second of them because Sharkroad itself produced the sales records on which DNA's damages computation depends at 6:14 p.m. on the day of the deadline*** — and a document production that Dkt. 68 does not show to be incomplete in any identified respect. Sharkroad does not identify a single document that DNA has and has not produced; it identifies categories of documents it expected to exist, and DNA's amended responses state, request by request, that after a reasonable search DNA has located no others.

The timing is this. The Minute Order set November 13 as the date for DNA's supplementation because Sharkroad's Rule 30(b)(6) deposition of DNA and the deposition of Jerry Lehman were then set for November 16 and 17. Those dates had been confirmed. At the conference, Sharkroad's counsel raised for the first time that it wanted to move them; because it had not discussed that with DNA's counsel beforehand, counsel could not confirm alternative dates with DNA's witnesses on the spot, and the dates were left in place, with the November 13 date set so that Sharkroad would have the

supplementation before them. Minutes after the conference ended, Sharkroad's counsel asked to move those depositions three weeks away, to the first week of December, to give itself time to review the supplementation. DNA agreed, and asked for a commensurate extension of the supplementation date. Sharkroad, however, agreed to extend the response period only to November 17 at 4:00 p.m. It also asked that DNA serve its interrogatory responses as soon as they were ready rather than hold them until the 17th. DNA served its 39-page amended interrogatory responses on November 13 (*the date in the Minute Order, and four days before the extended date agreed to among counsel*), produced documents on November 16 and 17, served its 170 pages of amended responses to the document requests on November 17, and served its remaining interrogatory responses on November 18 and 19. The last of those — the Second Amended Responses to the First Set of Interrogatories and the Attorneys' Eyes Only Supplement — had to be built after DNA recognized, following its November 13 service, that several interrogatories called for contentions which, to be answered completely, encompassed documents Sharkroad had designated Attorneys' Eyes Only and which therefore could not be reviewed by DNA's verifying officer; and they incorporate the sales schedules and third-party-wheel materials that Sharkroad itself produced after 4:00 p.m. on November 17. Sharkroad will have had every page for at least thirteen days before the December 2 depositions it chose to reschedule.[1]

Of further significant note, it was not until after the 4:00 p.m. deadline on November 17 that Sharkroad produced 350 pages (Sharkroad_001209–001559), including sales records (and purported cost deductions) for the accused products updated with significant and ongoing sales — Sharkroad's previous production had covered sales only through April 2026. DNA was entitled to current records at the Rule 30(b)(6)

---

[1] The deposition date is actually scheduled for December 2, 2026, not December 4 as stated in Sharkroad's Supplemental Statement Regarding Remaining Discovery Disputes (Dkt. 68).

deposition of Sharkroad on November 10, 2026, which included Topic No. 21, "Units sold, revenues, costs, and profits of the Accused Products . . . ." The updated records were produced neither before that deposition nor before the agreed 4:00 p.m. deadline; ***they were produced by e-mail at 6:14 p.m. on November 17, requiring review of, and changes to, the supplementation DNA had been finalizing for service that evening***. (Vakili Decl. Exs. E, H.) Sharkroad's remaining complaints about the timing of DNA's responses are, in that light, self-inflicted.

## II. WHAT DNA HAS SERVED AND PRODUCED SINCE THE CONFERENCE OF NOVEMBER 9, 2026

| DATE | SERVED OR PRODUCED |
|---|---|
| November 13, 2026 | Amended Responses to Sharkroad's First Set of Interrogatories (Nos. 1–22) (39 pages), served on the date set by the Minute Order. |
| November 16, 2026 | Document production DNA-00473–00606 (134 pages): DNA's dated "New Spokes" advertisement for its Cali spokes (DNA-00473); third-party spoke and fat-spoke-wheel listings (DNA-00474–00478); DNA's June–December 2023 Instagram posts introducing and promoting the Cali Spoke wheels, with the capture pages and native images (DNA-00479–00513); statements of three DNA sales personnel concerning the effect of Sharkroad's wheel on DNA's sales, and DNA's list of dealer customers contacted (DNA-00514–00517, Confidential); and, designated Attorneys' Eyes Only, DNA's summary of Cali Spoke wheel sales and the purchase-order history for the Cali spokes from which it is derived (DNA-00518–00520), DNA's vendor-booth invoices for the Lone Star Rally (2023–2025), Las Vegas Bikefest 2026, the Los Angeles Super Show and the Las Vegas Motorcycle Rally (DNA-00521–00523, 00603–00606), and the flight, hotel and car-rental records for DNA personnel's attendance at motorcycle rallies and shows in 2025–2026 (DNA-00524–00602). |
| November 17, 2026 | First Amended Responses to Sharkroad's First Set of Requests for Production (Nos. 1–89) (122 pages) and Second Set of Requests |

| DATE | SERVED OR PRODUCED |
|---|---|
| | for Production (Nos. 90–118) (48 pages), served at 4:23 p.m.; and document production DNA-00607–00689 (83 pages), DNA's 2023 product catalog. |
| November 18, 2026 | First Amended Responses to Sharkroad's Second Set of Interrogatories (Nos. 23–25) (26 pages); and document production DNA-00690–00694 (5 pages, Attorneys' Eyes Only), DNA's inventory sold reports for its Fat 52 (Mammoth 52) wheels, by item number, for January 2021 through November 2026. |
| November 19, 2026 | Second Amended Responses to Sharkroad's First Set of Interrogatories (Nos. 1–22) (67 pages); and DNA's Attorneys' Eyes Only Supplement to those responses (13 pages), served on Sharkroad's outside counsel of record under Section 7.2 of the Protective Order. |
| November 20, 2026 | Verifications of DNA's Vice President, Alex Marquez, for the Second Amended Responses to the First Set of Interrogatories (executed November 19) and the First Amended Responses to the Second Set of Interrogatories (executed November 18), and the Rule 33(b)(1)(B) verification of DNA's counsel for the Attorneys' Eyes Only Supplement (executed November 19), served at 3:54 p.m., before Sharkroad filed Dkt. 68. |

The amended responses to the requests for production are not a restatement of objections. Each one incorporates the original objections, then identifies by Bates number the documents DNA has produced that are responsive to that request, states that DNA has located no other responsive documents, and states whether DNA is withholding anything on the basis of its objections. ***The only documents withheld are DNA's privileged communications with its patent prosecution counsel concerning the '968 application and with its litigation counsel; DNA will serve a log of the prosecution-counsel communications by November 30, 2026, although the log will identify nothing Sharkroad does not already know — the responses state what is withheld and why — and has no bearing on the depositions.*** The responses also describe the search DNA

conducted — its hard-copy business records, its accounting and order-management system, the e-mail accounts of its principals and of the personnel involved with the products at issue, its social-media accounts, and the records it was able to obtain from its manufacturer — and disclose, as DNA has told Sharkroad since the parties' first conference of counsel, that DNA's premises were burglarized in or about 2018 and its servers and computers stolen, which limits the historical records that exist, particularly for the period before 2018.

The Second Amended Responses to the First Set of Interrogatories state DNA's contentions and the facts supporting them on each of the subjects Sharkroad raised at the conference — conception and first use of the designs, the elements and secondary meaning of each claimed trade dress, copying, the third-party wheels Sharkroad has identified as prior art, confusion, and damages — and identify the documents and witnesses for each. Because several of those contentions rest on documents Sharkroad has designated "Confidential: Attorney's Eyes Only" (its engineering drawing, its sales schedules, and its customer correspondence), which may not be shown to DNA's officers under Section 7.2 of the Protective Order, those contentions are stated in a separate supplement prepared, signed and verified by DNA's outside counsel as DNA's agent under Rule 33(b)(1)(B), so that DNA's officer could verify the balance of the responses without being shown Sharkroad's designated material. The supplement states that DNA will serve an officer-verified restatement if Sharkroad agrees under Section 7.2, or the Court orders, that the information may be disclosed to DNA's verifying officer.

## III. THE TIMING OF DNA'S SUPPLEMENTATION

### *A. The November 13 Date Was Set with the November 16 and 17 Depositions In View.*

When the parties appeared on November 9, Sharkroad's Rule 30(b)(6) deposition of DNA and its deposition of Mr. Lehman were noticed for November 16 and 17. Sharkroad presented the November 13 date as necessary so that it would have DNA's

supplementation before those depositions, and the Court set that date. The November 16 and 17 dates had been confirmed. At the conference, Sharkroad raised for the first time that it wanted to move them. Because Sharkroad had not discussed that with DNA's counsel before the conference, counsel was not in a position to confirm any new dates with DNA's witnesses on the spot. The dates were therefore kept, and the November 13 date was set on the understanding that Sharkroad needed DNA's supplementation before November 16 and 17. Sharkroad did not ask that the supplementation date be set by reference to the later deposition dates it evidently had in mind. The Court also indicated that if Sharkroad had to begin the depositions and hold them open because the supplementation came too late to be reviewed, it would consider whether the cost of resuming them should be shifted.

### *B. Sharkroad Moved the Depositions Three Weeks, Then Declined a Corresponding Extension.*

At 1:32 p.m. on November 9 — minutes after the conference concluded — Sharkroad's counsel wrote to request that the depositions be rescheduled to December 2, 3 or 4 "so we have time to review the supplemental material," explaining that Sharkroad wished "to avoid the situation where we have [to] start the depositions and then hold them open." (Vakili Decl. Ex. A.) The e-mail describes the request as one Sharkroad had "mentioned during the IDC this afternoon." It had: the conference was the first time Sharkroad had raised moving the confirmed dates with DNA's counsel, who for that reason could not confirm new dates with DNA's witnesses there, and the dates were left in place on that footing, with the November 13 date set on the premise that the depositions would go forward. Thirty minutes later, Sharkroad asked to move them anyway, "so we have time to review the supplemental material." DNA's counsel responded on November 10 that he had proposed the November 13 date at the conference so that Sharkroad would have the amended responses before the depositions, that he would be meeting with DNA the following day, and that if the depositions were moving out three weeks, DNA would

appreciate more time to prepare them. (Vakili Decl. Ex. B.) Sharkroad's counsel replied the next morning that Sharkroad could not move the supplementation date "by much" because of the November 20 status report and the November 23 conference, offered to extend it "through the weekend" to Monday, November 16 at 11:00 a.m., and stated that absent an agreement to postpone the depositions Sharkroad would proceed with them, hold them open, and ask the Court to shift the cost. (Vakili Decl. Ex. C.) That afternoon Sharkroad proposed that DNA serve its supplementation by 4:00 p.m. on Tuesday, November 17, and that the depositions be moved to Wednesday, December 2, 2026 (Vakili Decl. Ex. D), and DNA accepted. Sharkroad's stated concern in setting that date was not the depositions, which it had just moved, but "having enough time to review the supplementation before the joint statement is due to the Court on November 20." (*Id.*) In the same e-mail, Sharkroad asked that, if DNA's interrogatory responses were ready by November 13, DNA "serve them as soon as they are complete rather than holding them until the 17th." (*Id.*) DNA did exactly that.

### *C. DNA's Service.*

DNA served its Amended Responses to the First Set of Interrogatories (39 pages) on Friday, November 13 — the date in the Minute Order, four days before the extended date Sharkroad later agreed to, and as Sharkroad had asked. It produced 134 pages of documents on Monday, November 16 and a further 83 pages on Tuesday, November 17, and at 4:23 p.m. on November 17 it served its 170 pages of amended responses to Sharkroad's 118 requests for production. It served its amended responses to the Second Set of Interrogatories (Nos. 23–25) and produced its inventory sold reports (DNA-00690–00694) on Wednesday, November 18, and its Second Amended Responses to the First Set of Interrogatories, with the Attorneys' Eyes Only Supplement, on Thursday, November 19. It served the verifications on November 20. (Vakili Decl. Ex. G.)

DNA acknowledges that the last two sets of interrogatory responses were served one and two days after the time the parties had agreed, and it does not minimize that. The reasons are these:

*First*, the amended interrogatory responses DNA served on November 13 were prepared by counsel, and after serving them DNA's counsel recognized that a number of the interrogatories — those directed to copying, to Sharkroad's sales, and to damages — call for DNA's contentions about documents that Sharkroad has designated "Confidential: Attorney's Eyes Only" (its engineering drawing at Sharkroad_000848, its sales records, and its customer correspondence), and that under Section 7.2 of the Protective Order those contentions could not be placed before DNA's officer for verification. (No one at DNA reviewed the November 13 responses.) DNA therefore had to prepare a second set of amended responses, confined to what its officer could review and verify, and a separate Attorneys' Eyes Only supplement verified by counsel as DNA's agent under Rule 33(b)(1)(B), and had to work out a format that would let it answer each interrogatory fully without violating the Protective Order. That is the structure of the responses served on November 19, and it is one that Sharkroad's own designations made necessary.

*Second*, at 6:14 p.m. on November 17 — ***after the 4:00 p.m. deadline*** — Sharkroad produced Sharkroad_001209–001559, some 350 pages. (Vakili Decl. Ex. E.) The production included new sales schedules for the accused wheels (Sharkroad_001330–001431) that, for the first time, separated Sharkroad's sales by channel and by wheel size and carried them forward from April 2026, where Sharkroad's earlier production had stopped, together with some 250 pages of third-party-wheel and claimed prior-art materials (Sharkroad_001209–001329 and Sharkroad_001432–001559). DNA had been entitled to current sales records at Sharkroad's Rule 30(b)(6) deposition on November 10, 2026, which included Topic No. 21, "Units sold, revenues, costs, and profits of the Accused Products . . . ." (Vakili Decl. Ex. H.) ***Those productions bear directly on DNA***

***Interrogatory response Nos. 11, 14, 16, 17, 20 and 22 (copying, the third-party wheels Sharkroad relies on, and damages)***. Rather than serve interrogatory responses on November 17 that would have been out of date the following morning, DNA incorporated Sharkroad's new productions into its responses — Sharkroad's own November 17 schedules are now the basis of the sales figures stated in DNA's response to Interrogatory No. 22 — which required a further round of revision of both the response and the supplement after the 6:14 p.m. production arrived. *If any party has cause to complain about the timing of the other's sales records, it is DNA, which took Sharkroad's Rule 30(b)(6) deposition on Topic No. 21 a week before Sharkroad produced the current figures.*

Third, the information for the responses had to be gathered from DNA, a small company, in the week between the conference and the deadline. On November 11, DNA's counsel, Mr. Vakili and Mr. McLaughlin, spent approximately eight hours at DNA's facility gathering the information and documents needed for the responses to both sets of interrogatories and both sets of requests for production. (Vakili Decl. ¶ 6.) Several DNA personnel assisting them were ill or recovering from the flu or other respiratory illness that week, including Alex Marquez, Jerry Lehman, and DNA's accountant, whose assistance was needed for the sales, cost, and inventory information called for by the damages interrogatories and the sales-related requests.

Sharkroad has therefore had DNA's complete supplementation since November 19 — which is thirteen days before the December 2 depositions, and fifteen days before the December 4 fact-discovery cutoff. That is more than four times the interval between the original November 13 date and the depositions as they were originally set.

***D. Sharkroad's November 18 Email and the Meet-and-Confer Request.***

Sharkroad's November 18 e-mail states that "[a]s of that deadline, DNA made two productions" and lists the November 16 and 17 document productions. (Vakili Decl. Ex. F.) It does not mention the amended interrogatory responses DNA served on November

13, or the 170 pages of amended responses to the requests for production served on November 17. It was written before DNA's November 18 production of its inventory sold reports and before Sharkroad received the Second Amended Responses and the Attorneys' Eyes Only Supplement on November 19. It did not identify a single request by number; it referred, generally, to Sharkroad's November 5 statement (Dkt. 62), which was written before any of DNA's supplementation existed. Sharkroad offered a meet-and-confer window of 2:00 to 4:30 p.m. the following day, November 19, during which DNA's counsel were completing the Second Amended Responses and the Supplement for service that day. Dkt. 68 states that DNA "has not responded to that request." The request was premature because additional responses were produced; it was limited to a two-and-a-half-hour window, and no mention was made of a meet and confer after further responses were provided. Dkt. 68 is the first document in which Sharkroad has identified, by request number, what it contends remains deficient after DNA's supplementation; DNA responds to each category in Part V below.

### *E. The Effect of the Sequence.*

The sequence matters. Sharkroad obtained a November 13 supplementation date on the footing that it needed DNA's supplementation before depositions on November 16 and 17. Within the hour, it asked to move those dates three weeks for its own convenience. Once the depositions moved to December 2, the November 13 date no longer served the purpose for which it was set; a supplementation date of November 20 or 23 would have given Sharkroad a longer interval before the depositions than the Court had provided. Sharkroad nonetheless declined to move the date by more than four days, tied the date it would accept to its own convenience in preparing the November 20 statement, and announced in the same breath that it would seek cost-shifting. DNA does not presume to know why Sharkroad waited until the conference itself to raise moving dates that had been confirmed, without first discussing it with DNA's counsel, and then — having obtained a supplementation date premised on those dates holding — asked

within the hour to move them three weeks, rather than ask the Court to set the supplementation date by reference to the deposition dates it actually intended to use. But the effect of the sequence is that a date set to protect a deposition schedule that Sharkroad itself discarded has become the sole basis for a request to preclude DNA's evidence on claims that have not been prejudiced at all. The November 13 date should not be used for a purpose it was never set to serve.

## IV. THE PRECLUSION ORDERS SHARKROAD REQUESTS ARE UNWARRANTED

### *A. The Governing Standard.*

Sharkroad asks the Court to order that DNA "may not supplement its document production" after November 17 in every category of documents at issue, and to preclude DNA from relying on damages computations, continuous-use testimony, exclusivity evidence, and confusion evidence. (Dkt. 68 at 10.) An order "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence" is a sanction available under Rule 37(b)(2)(A)(ii) only where a party "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). Exclusion under Rule 37(c)(1) is available where a party "fails to provide information or identify a witness as required by Rule 26(a) or (e)," and then only where the failure was neither "substantially justified" nor "harmless." Fed. R. Civ. P. 37(c)(1). And where the exclusion sought "amounted to dismissal of a claim, the district court was required to consider whether the claimed noncompliance involved willfulness, fault, or bad faith [*citations omitted*], and also to consider the availability of lesser sanctions." *R & R Sails*, 673 F.3d at 1247. Preclusion of DNA's damages computations, of its evidence of first and continuous use, and of its evidence of actual confusion would be exactly that: the dismissal, in substance, of its damages claims and of the priority and likelihood-of-confusion elements of its trade dress claims.

Sharkroad's request also runs against the structure of the Rules. Rule 26(e)(1)(A) requires a party to supplement its responses and production "in a timely manner" whenever it learns that a response is incomplete. An order forbidding DNA to supplement its production after November 17 would not enforce that duty; it would prohibit DNA from performing it, and would then expose DNA to exclusion under Rule 37(c)(1) for the very documents it had been forbidden to produce. The Rules address late-produced evidence case by case, when it is offered, on a showing of what was produced, when, and with what effect — not by a prospective order, entered before any such document exists, freezing a party's production as of a date two weeks before the close of fact discovery.

***B. There Was No Failure to Obey, and No Failure to Disclose.***

DNA served its amended responses to the First Set of Interrogatories on November 13, the date in the Minute Order. The balance of its supplementation was governed by the stipulated November 17 date that Sharkroad itself proposed. DNA met that date for its document productions and its 170 pages of amended document-request responses, and served its two remaining sets of interrogatory responses one and two days later, for the reasons stated in Part III.C. Sharkroad does not contend that any of those interrogatory responses is deficient in content; its only stated complaint about the interrogatory responses in each of Sections II.A, II.I and II.L of Dkt. 68 is "late service." A delay of one and two days against a stipulated date — ***occasioned in part by Sharkroad's own 6:14 p.m. production on the day of the deadline, and in part by the Protective Order structure that Sharkroad's designations required*** — is not willfulness, fault, or bad faith, and it is not the kind of failure for which the Rules reserve the exclusion of a party's evidence.

***C. Sharkroad Has Not Been Prejudiced.***

Sharkroad has had DNA's complete supplementation since November 19, thirteen days before the depositions it rescheduled and fifteen days before the fact-discovery cutoff. Expert discovery, in which damages will be quantified, does not close until

January 8, 2027. Sharkroad identifies no deposition it has been unable to take, no witness it has been unable to examine, and no document it needs that it does not have. The one and two days at issue did not shorten any of those intervals in a way that matters. And Sharkroad's own supplementation continued through November 17 at 6:14 p.m. — including the sales records on which DNA's damages computation rests. A party that produces its current sales data after its opponent's deadline cannot then ask the Court to freeze its opponent's damages computations as of that deadline.

### *D. The Relief Would Reward the 2018 Burglary and Reach Documents DNA Does Not Yet Have.*

Sharkroad's proposed order would bar DNA from supplementing its production of "historical use records," "sales, cost, profit, and accounting records," and documents "offered to show copying," among others. DNA has told Sharkroad, in its Second Amended Response to Interrogatory No. 18, that its own pre-2018 records were lost in the burglary of its premises, that the earliest surviving DNA documents showing the Mammoth wheel are its 2021 catalog and its FAT flyers, that use before 2018 is corroborated by the 2011, 2012 and 2014 third-party forum posts and the 2014 dealer page that Sharkroad itself produced, and that DNA is searching for surviving pre-2018 records outside its stolen systems — tax and merchant-account records, supplier invoices and dealer catalogs — and will supplement with any it locates. An order precluding that supplementation, and precluding DNA from "offering testimony to establish earlier or continuous use beyond the facts disclosed in its interrogatory answers," would convert a burglary into a forfeiture. It would also reach documents that are not DNA's to produce on any schedule: records DNA obtains from its manufacturer, its dealers, or third parties, and documents Sharkroad itself produces — as it did on November 17 — which DNA is entitled to rely on to show copying and damages whenever they arrive.

### *E. Cost-Shifting.*

Dkt. 68 does not ask the Court to shift the cost of the depositions, and DNA addresses the subject only because the Court previewed it and Sharkroad's counsel raised it in correspondence. Rule 37(b)(2)(C) permits an award only of "the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." A civil sanction of this kind is compensatory; it must be "calibrate[d] to [the] damages caused by" the conduct at issue, and the complaining party "may recover 'only the portion of his fees that he would not have paid but for' the misconduct." *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108–09 (2017) (quoting *Fox v. Vice*, 563 U.S. 826, 836 (2011)). The premise of the cost-shifting the Court previewed was that Sharkroad might have to begin the depositions on November 16 and 17 without DNA's supplementation and then hold them open. That did not happen and will not happen: Sharkroad asked to move the depositions before any deadline had passed and before it had seen a page of DNA's supplementation, and it will take them on December 2 with the complete supplementation in hand. The expense of taking them on that date is the ordinary expense of depositions Sharkroad noticed; it is not an expense "caused by" anything DNA did or failed to do. And the circumstances described in Part III are ones about which "reasonable people could differ," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), and that would "make an award of expenses unjust," Fed. R. Civ. P. 37(b)(2)(C). If Sharkroad intends to seek cost-shifting or any other sanction, it should do so by noticed motion under Rule 37 and Local Rule 37-1 *et seq.*, on a record.

## V. RESPONSE TO SHARKROAD'S CATEGORY-BY-CATEGORY CONTENTIONS (DKT. 68, PART II)

DNA responds below to each category in Part II of Dkt. 68, using Sharkroad's lettering. A recurring feature of Sharkroad's statement should be noted at the outset: in most categories, Sharkroad's complaint is that DNA's November 16–18 productions did

not include documents of a particular kind. That is because those documents were produced earlier — on June 20, August 11, August 17, September 1, October 16, October 23 and November 4, 2026 — and are identified by Bates number in the amended responses served November 17. The November 16–18 productions were the documents DNA located in the search it completed after the conference, not a re-production of everything it had already produced.

### *A. Interrogatory Answers That Referred to Pleadings (Dkt. 68 § II.A).*

Each of the interrogatories Sharkroad lists (First Set Nos. 1, 3–5, 11, 13, 17, 19, 21; Second Set Nos. 23–25) has now been answered with facts, in the responses served November 13, 18 and 19. Sharkroad identifies no deficiency in the content of any of them; its only point is "late service," addressed in Part IV.B. The relief it requests under this heading — preclusion of "damages computations it did not timely disclose" — is addressed in Section L below.

### *B. Second Set of Document Requests — the "DNA Twisted Spoke" (Dkt. 68 § II.B).*

DNA's amended responses to Request Nos. 90–97, 99–113 and 118 identify every document DNA has located concerning the traditional twisted-spoke option shown at page 43 of its 2021 catalog: the March 7, 2013 engineering drawing "16-inch Twisted Mammoth Spoke," Part No. M-SP-1604, annotated by hand "original twisted spoke" (DNA-00441); the catalog pages (DNA-00247, DNA-00259); the flyers and price sheets offering the option (DNA-00068, 00071, 00074, 00078, 00105, 00109); and, for the spiral spoke that DNA's manufacturer called the "new twisted spoke sample," the complete 2023 development file (DNA-00442–00461). They state, for each of the categories Sharkroad says it "has reason to expect," that DNA has located no manufacturer, distributor, invoice, importation or shipping records that separately identify the traditional twisted-spoke option (Nos. 92, 93, 97, 110), after the search described in the Statement Regarding Amended Responses. Sharkroad's expectation that such records

must exist is not evidence that they do. Sharkroad's assertion that DNA-00441 "depicts a different spoke product" is a characterization, not a deficiency; DNA-00441 is the drawing of the twisted Mammoth spoke that DNA offered before 2023, as its Second Amended Responses to Interrogatory Nos. 5, 7 and 8 explain. Sharkroad may examine DNA's Rule 30(b)(6) designee and Mr. Lehman on the subject on December 2.

***C. S.P.R. 3-2 Identification (Dkt. 68 § II.C).***

Every category of document that S.P.R. 3-2 calls for has been produced and is identified by Bates number in DNA's amended responses: the documents evidencing conception, design and reduction to practice of the '968 design (DNA-00035–00037, 00208–00216, 00317–00328, 00442–00461); the first sale, offer for sale and public disclosure of the products embodying it (DNA-00140, 00439–00440, 00478–00483, 00016–00021, 00101–00111); the file history (DNA-00347–00422); and the ownership documents (DNA-00402–00404, 00421, and the recorded assignments at Sharkroad_000610–000618). Sharkroad has had the documents themselves since September 1 and October 23, 2026, and the amended responses tell it which documents answer which request. A separate identification by S.P.R. 3-2 category would add a cross-reference, not a document; DNA does not believe one is required, but will provide one if the Court directs. There is no basis for an order precluding DNA from producing documents "required by S.P.R. 3-2" after November 17.

***D. Conception and Development of the '968 Patent Design (Dkt. 68 § II.D).***

Sharkroad says DNA produced "no additional design drawings, revisions, or communications" on November 16–18. It did not need to; the development file was produced months ago and is identified in DNA's amended responses to Request Nos. 1, 4, 13 and 107–109: the drawing revisions (DNA-00035–00037), the engineering drawings of April and May 2023 (DNA-00208–00216), the draftsman's initial drawings (DNA-00317–00321), the first-article inspection reports (DNA-00322–00328, 00444–00452), Purchase Order No. 1316 and the bill of lading (DNA-00442–00443), the

manufacturer's sample photographs, and the January–June 2023 "new twisted spoke sample" and "Spiral Report" correspondence with the manufacturer (DNA-00444–00461). DNA's Second Amended Response to Interrogatory No. 5 describes who did what and when. Sharkroad's speculation that the production "do[es] not appear to include the full communications" among Mr. Choi, Mr. Nguyen and Mr. Lehman is answered by DNA's amended responses to Request Nos. 99–106, which state, after a search of the email accounts of each of the DNA correspondents and of Mr. Lehman, which communications exist and that no others were located; the idea for the design was communicated within a small company, and the drawings were prepared and revised by hand and in CAD, as the produced documents show.

***E. Prior-Art Knowledge and Searches (Dkt. 68 § II.E).***

DNA's Second Amended Responses to Interrogatory Nos. 7 and 8 state, product by product, what Mr. Lehman knew before and during prosecution, why he concluded each item was not material, and that he made the decision not to submit it. DNA's amended response to Request No. 7 states that the only prior-art search reflected in DNA's documents is the Examiner's (DNA-00377–00387, 00398–00401). Sharkroad's complaint that DNA "produced no record of Lehman's search during prosecution" assumes a record that does not exist: Mr. Lehman's consideration of DNA's own products and of competitors' catalogs was not reduced to a search report, and a party cannot produce a document it never created. Sharkroad may examine Mr. Lehman on the subject on December 2.

***F. Patent Marking (Dkt. 68 § II.F).***

DNA's amended response to Request No. 12 identifies the "Patent Pending" advertisement (DNA-00072, 00307, 00473; the latter two bearing the handwritten date 12/26/24) and the July 1, 2025 correspondence from DNA's prosecution counsel concerning marking (DNA-00311–00312), and states that DNA has located no other responsive documents. Who wrote the date on the flyer, and when it was distributed, are

questions for the Rule 30(b)(6) designee on December 2, not grounds for a preclusion order. Whether DNA's marking satisfied 35 U.S.C. § 287(a) for any period is a merits question that Sharkroad may litigate on the documents DNA has produced and on the May 15, 2024 and June 16, 2025 notice letters DNA sent Sharkroad (Exhibits to the First Amended Complaint).

### *G. First and Continuous Use of the Trade Dresses (Dkt. 68 § II.G).*

For the spiral-spoke trade dress, DNA's Second Amended Response to Interrogatory No. 12 states the dates and documents of first use (the January 11, 2023 spoke order, the June 7 and 14, 2023 flyers, the June 16, 2023 Instagram posts, and the June 30, 2023 first sale) and of continuous use since, with Bates citations. Sharkroad does not say what is missing. For the cylindrical-spoke trade dress, DNA's responses to Interrogatory No. 18 and Request Nos. 44–46, 50 and 62 state that use began in approximately 2001 with a flyer sent to potential customers; that DNA's own records from that period were lost in the 2018 burglary, so that the earliest surviving DNA documents are its 2021 catalog (DNA-00217–00299) and its FAT flyers (DNA-00079–00080); that use before 2018 is corroborated by third-party documents Sharkroad produced — an August 2011 forum post that "the 5 spoke fat spokes are made by DNA" (Sharkroad_000924–000926), a March 2012 post (Sharkroad_001042–001046), a November 2014 thread entitled "DNA Mammoth Wheels" (Sharkroad_000619–000623), and a dealer page listing DNA "Mammoth Wheels" archived August 25, 2014 (Sharkroad_000942); and that DNA is searching for surviving pre-2018 records outside its stolen systems and will supplement with any it locates. Sharkroad's request to preclude DNA "from offering testimony to establish earlier or continuous use beyond the facts disclosed in its interrogatory answers" would bar Mr. Lehman from testifying to what he knows about a product he has sold since 2001 because the documents were stolen; no rule supports that. As to Sharkroad's request that DNA identify which records were lost and what it has done to recover copies, DNA has already stated that it reached out to current

and former manufacturers for missing records and has produced what it has been able to locate to date.

***H. Secondary Meaning (Dkt. 68 § II.H).***

The only item Sharkroad identifies as "missing" is "the date on which each design allegedly acquired secondary meaning." Interrogatory Nos. 11 and 17 do not ask for that date; they ask for the facts on five enumerated subjects — purchaser association, the degree and manner of advertising, the length and manner of use, exclusivity, and persons with knowledge — and DNA's Second Amended Responses answer each, with Bates citations, including the trade shows at which each product was promoted, the catalogs, flyers, price sheets and social-media advertising, the first-use dates, the third-party uses and DNA's position on each, and the customers and employees with knowledge. DNA is nonetheless willing to state its contention: DNA contends that each trade dress had acquired secondary meaning before Sharkroad's first sales of the accused products in 2024. Sharkroad's remaining point — that the trade-show and travel records "do not establish which asserted design was promoted or whom the promotion reached" — is a comment on the weight of the evidence. DNA promotes both wheel lines at the shows it attends; the catalogs and flyers it distributes there show what was promoted; and the invoices and travel records are the documents responsive to Sharkroad's requests for DNA's advertising and promotional expenditures (Request Nos. 29 and 49).

***I. Exclusivity (Dkt. 68 § II.I).***

Sharkroad's only complaint under this heading is "late service." The substance is complete: DNA's amended responses to Request Nos. 31 and 51 state that DNA has no licensing agreement for either trade dress and identify every enforcement effort — the October 2025 and October 2026 correspondence with HoPro USA (DNA-00462–00472), DNA's May 15, 2024 and June 16, 2025 letters to Sharkroad, and this action — and DNA's Second Amended Responses to Interrogatory Nos. 10, 11, 16 and 17 address each third-party use of which DNA is aware and DNA's position on it. An order precluding

DNA "from relying on untimely enforcement, licensing, or other exclusivity evidence" has no object; DNA has identified all of it.

***J. Likelihood of Confusion (Dkt. 68 § II.J).***

DNA's evidence of actual confusion is identified in its amended responses to Request Nos. 28, 37, 41, 48, 57 and 63 and its Second Amended Responses to Interrogatory Nos. 14 and 20: the August 17, 2026 letter of Mark Richardson of Eagle Parts (DNA-00346); the statements of DNA's sales representatives Vannessa Horsey, Lashonda Nave and Erendira Fernandez (DNA-00514–00516); the list of customers contacted (DNA-00517); the customer comments on DNA's Instagram posts (DNA-00426–00438, 00478–00513); the dealer that mistakenly returned an accused Sharkroad wheel to DNA; and the September 2025 customer correspondence that Sharkroad itself produced and designated Attorneys' Eyes Only (Sharkroad_001207–001208), which is addressed in the Supplement. Sharkroad says DNA agreed (Dkt. 63 at 7) to produce its communications with the third-party witnesses in its Initial Disclosures or confirm that none exist. DNA has located no written communications with the four customer witnesses identified in its Initial Disclosures or with Mr. Calise concerning confusion; the instances were reported orally to DNA's sales personnel, whose statements DNA has produced. Sharkroad may examine the three sales representatives and the Rule 30(b)(6) designee; it has their names and the documents. There is no basis to preclude "any additional undisclosed evidence of actual confusion": DNA has disclosed what it has, and Rule 26(e) governs anything it learns later.

***K. Advertising — Dates and Linked Content (Dkt. 68 § II.K).***

DNA's amended response to Request No. 14 identifies every advertisement DNA has located, with its date where one exists: the 2023 flyers and mailers bearing handwritten dates from June 7 through December 13, 2023 (DNA-00016–00021, 00439–00440), the product flyers and mailers (DNA-00065–00100), the "Patent Pending" advertisement (DNA-00072, 00307, 00473), the 2023 price sheets (DNA-00101–00111),

the native spreadsheet listing DNA's social-media posts (DNA-00112), and the Instagram captures with posting dates and the source images (DNA-00304–00306, 00426–00438, 00478–00513) — the "linked content" Sharkroad asked for. The November 16 production supplied the dated captures and native images. Sharkroad identifies nothing further that it believes exists.

### *L. Sales, Costs, Profits and Damages (Dkt. 68 § II.L).*

*The damages computation.* DNA served its Damages Contentions on August 11, 2026 under S.P.R. 3-8, and its Second Amended Response to Interrogatory No. 22, served November 19, sets out its damages contentions claim by claim — design patent infringement (35 U.S.C. §§ 284 and 289), each trade dress claim (15 U.S.C. § 1117(a)), and unfair competition — with the methodology, the figures, and the documents for each, and with the Attorneys' Eyes Only figures stated in the Supplement. Sharkroad's complaint that the November 13 answer "provides no claim-by-claim damages calculation" and that the November 19 answer came "late in the evening on November 19" omits why: ***the figures in the November 19 answer are computed from the sales schedules Sharkroad produced at 6:14 p.m. on November 17*** (Sharkroad_001330–001431), which superseded the records Sharkroad had produced before, and which DNA had sought at Sharkroad's Rule 30(b)(6) deposition on November 10. A computation of Sharkroad's profits cannot be served before Sharkroad produces its sales. An order precluding DNA from relying on "damages computations it did not timely disclose" would exclude computations that Sharkroad's own late production generated. And damages will be quantified in expert reports, on the schedule the Court set; Rule 26(a)(1)(A)(iii) requires a computation of each category of damages and the documents on which it is based, and DNA has provided both.

*Underlying records.* DNA has produced its sales, cost and profit records as its systems generate them: the customer invoices and proforma invoices for the Cali Spoke wheels (DNA-00140–00207, 00329–00333, 00423–00425), the purchase-order history

reflecting its spoke costs (DNA-00113–00137), the sales, cost and profit summaries (DNA-00138–00139), the June 2023 sales summary and sold-quantity history (DNA-00518–00520), the inventory sold reports for the Fat 52 wheels by item number (DNA-00690–00694), the manufacturer's price quotation and Purchase Order No. 1316 (DNA-00442, 00460), and the price sheets (DNA-00101–00111). Sharkroad calls DNA-00138–00139 "aggregate" summaries without "underlying accounting records." Those are the records DNA keeps; the summaries were prepared from the invoices, purchase-order history and inventory reports that DNA has produced, and Sharkroad may examine DNA's Rule 30(b)(6) designee on December 2 about how they were prepared. Sharkroad does not identify any accounting record that it contends exists and has not been produced. DNA has produced what it has located; discovery is ongoing, and DNA will supplement under Rule 26(e) if it locates more, as the Rules require of both parties. As to lost sales, the Eagle Parts letter is the documented lost sale; the decline in DNA's sales after Sharkroad's entry, reflected in DNA-00138–00139 and DNA-00690–00694 and described by DNA's sales representatives (DNA-00514–00516), is the basis for DNA's lost-profits contention, which its expert will quantify.

***M. Copying and Willfulness (Dkt. 68 § II.M).***

Sharkroad observes that none of the November 16–18 documents "addresses copying or willfulness." That is because the evidence of copying is in Sharkroad's own files, not DNA's: Sharkroad's engineering drawing (Sharkroad_000848), its August 25, 2023 incorporation date (Sharkroad_000004) — after DNA had begun advertising and selling the Cali Spoke — and its listings and sales records, all of which DNA's Second Amended Responses to Interrogatory Nos. 11 and 17 and the Supplement address, together with the chronology of DNA's own first use and the May 15, 2024 and June 16, 2025 notice letters, which DNA produced long ago and identifies in its amended responses to Request Nos. 21, 70 and 71. An order precluding DNA from "supplementing its production of documents offered to show copying or willfulness after November 17"

would bar DNA from relying on documents it obtains from Sharkroad or from third parties after that date. There is no basis for it.

***N. Continuing Reservations and Confirmation of Production (Dkt. 68 § II.N).***

Sharkroad says DNA "still has not confirmed that, after a reasonable search, it has produced all responsive, nonprivileged documents in its possession, custody, or control." It has. Each amended response states that "DNA has located no other documents responsive to this request at this time" and whether DNA is withholding anything, and the Statement Regarding Amended Responses describes the search and identifies the only documents withheld. The reservation of the right to supplement that Sharkroad objects to is not a hedge; it is the duty Rule 26(e) imposes. For the avoidance of doubt, DNA confirms, through its counsel, that after the search described in its amended responses it has produced all non-privileged documents responsive to Sharkroad's First and Second Sets of Requests for Production that it has located in its possession, custody or control, other than the privileged communications to be logged, and that it will supplement under Rule 26(e) if it locates more.

## VI. DNA'S PROPOSAL

DNA respectfully proposes that: (1) the preclusion orders requested in Dkt. 68 be denied, without prejudice to any objection under Rule 37(c)(1) to specific evidence when and if it is offered; (2) the Rule 30(b)(6) deposition of DNA and the deposition of Mr. Lehman proceed on December 2, 2026 as the parties agreed; (3) DNA serve its privilege log by November 30, 2026; (4) the parties' remaining discovery obligations, on both sides, be governed by Rule 26(e) rather than by a preclusion order; (5) Sharkroad confirm that its November 17 production of sales and cost records is complete through the date of production, and make its Rule 30(b)(6) designee available for a further two hours of examination on Topic No. 21 on the updated records; and (6) no order shifting costs be

entered. DNA remains willing to confer with Sharkroad at any time before the conference.

DATED: November 20, 2026

**VAKILI & LEUS, LLP**

By: /s/ *Sa'id Vakili*
Sa'id Vakili, Esq.
Craig McLaughlin, Esq.
*Counsel for Plaintiff DNA Specialty, Inc.*

# CERTIFICATE OF SERVICE

*DNA Specialty, Inc. v. Sharkroad, Inc., et al.*
*USDC C.D. Cal. Case No.: 2:25-CV-10379-MWC (RAOx)*

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is Vakili & Leus, LLP, 3701 Wilshire Boulevard, Los Angeles, Suite 1135, Los Angeles, California 90010.

On November 20, 2026, I served the foregoing document described as **PLAINTIFF DNA SPECIALTY, INC.'S STATEMENT FOR THE NOVEMBER 23, 2026 INFORMAL DISCOVERY CONFERENCE IN RESPONSE TO SHARKROAD, INC.'S SUPPLEMENTAL STATEMENT REGARDING REMAINING DISCOVERY DISPUTES (DKT. 68)** on all interested parties in this action at the addresses listed below, as follows:

R. Joseph Trojan, Esq.
*trojan@trojanlawoffices.com*
Dylan C. Dang, Esq.
*dang@trojanlawoffices.com*
Francis Wong, Esq.
*wong@trojanlawoffices.com*
Mehdi Poursoltani, Esq.
*poursoltani@trojanlawoffices.com*
**TROJAN LAW OFFICES, P.C.**
9250 Wilshire Boulevard, Suite 325
Beverly Hills, California 90212
**310/777-8399** | Fax: 310/777-8348

*Counsel for Defendant and Counterclaimant Sharkroad, Inc.*

I hereby certify that on the 20th day of November 2026, I will cause to be served the above-referenced document via the United States District Court's Electronic Filing Program on the designated recipient via electronic transmission through the CM/ECF system on the Court's website. The Court's CM/ECF system will generate a Notice of Electronic Filing ("NEF") to the filing party, the assigned judge, and any registered users in this action. The NEF will constitute service of the document. Registration as a CM/ECF user constitutes consent to electronic service through the Court's transmission facilities.

Executed on November 20, 2026, in Los Angeles, California.

/s/ *Jason C. Ming*
Jason C. Ming